UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WAUSAU UNDERWRITERS INSURANCE | : | |
| COMPANY, and EMPLOYERS | : | HONORABLE JOSEPH E. IRENAS |
| INSURANCE COMPANY OF WAUSAU, | : | |
| | : | CIVIL ACTION NO. 07-1316(JEI) |
| Plaintiffs, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| STATE AUTOMOBILE MUTUAL | : | |
| INSURANCE COMPANY, STATE AUTO | : | |
| PROPERTY AND CASUALTY INSURANCE | : | |
| COMPANY, ERIE INSURANCE COMPANY, | : | |
| and SCHUYLKILL STONE, INC., | : | |
| | : | |
| Defendants. | : | |


**APPEARANCES:**

JAFFE & ASHER, LLP
By:  Marshall T. Potashner, Esq.
     Krishna J. Shah, Esq.
600 Third Avenue
New York, NY 10016
     Counsel for Plaintiffs

MCKISSOCK & HOFFMAN, PC
By:  John J. McGrath, Esq.
25 Chestnut Street
Suite 108
Haddonfield, NJ 08033
     Counsel for Defendants State Automobile Mutual Insurance
     Company and State Auto Property and Casualty Insurance
     Company

MONTGOMERY CHAPIN & FETTEN
By:  Glenn A. Montgomery, Esq.
745 Route 202/206
Suite 101
Bridgewater, NJ 08807
     Counsel for Defendant Erie Insurance Company

COLLIER & BASIL, PC
By:  Richard F. Collier, Jr., Esq.
29 Thanet Road
Suite 201
P.O. Box 3720
Princeton, NJ 08543-3720
     Counsel for Defendant Schuylkill Stone, Inc.


**IRENAS**, Senior District Judge:

     This is an insurance coverage dispute among Defendant

Schuylkill Stone, Inc., ("Schuylkill"), the insured, and its

various insurers, Plaintiffs Wausau Underwriters Insurance

Company, and Employers Insurance Company of Wausau (collectively,

"Wausau"); and Defendants State Automobile Mutual Insurance

Company, State Auto Property and Casualty Insurance Company

(collectively, "State Auto"), and Erie Insurance Company

("Erie").[1]  Wausau is defending Schuylkill, under a complete

reservation of rights, in a state court lawsuit involving stone

fascia allegedly manufactured or distributed by Schuylkill.[2]  Its

defense of Schuylkill notwithstanding, Wausau asserts that under

the relevant policies, it is not obligated to defend or indemnify

Schuylkill in the Laurel Creek Litigation.  Wausau further

---

     [1]  There is complete diversity among the parties and the
amount in controversy exceeds $75,000.  The Court has subject
matter jurisdiction pursuant to 28 U.S.C. § 1332.

     [2]  *See The Townhomes at Laurel Creek Country Club
Condominium Association v. Toll Brothers, Inc. and Bell Supply
Company*, Superior Court of New Jersey, Burlington County, Docket
No. L-2966-05.  The Court will refer to this suit as "The Laurel
Creek Litigation."

asserts that State Auto and Erie are obligated to participate in Schuylkill's defense and indemnify Schuylkill.  State Auto and Erie deny that their policies cover the Laurel Creek Litigation. Schuylkill asserts that the relevant Wausau policies cover the Laurel Creek Litigation.[3]

Currently before the Court are: (1) Schuylkill's Motion for Judgment on the Pleadings with respect to Wausau's alleged duty to defend, and Motion for a Stay with respect to Wausau's alleged duty to indemnify (Docket #45); (2) Wausau's Cross-Motion for Summary Judgment against Schuylkill / Motion for Summary Judgment on its claims against State Auto and Erie (Docket #49); (3) State Auto's Cross-Motion for Summary Judgment against Wausau (Docket #56); and (4) Erie's Cross-Motion for Summary Judgment against Wausau (Docket #59).

**I.**

The relevant facts are undisputed.

<u>The Underlying State Court Litigation</u>

Currently pending in the Superior Court of New Jersey is a lawsuit (the Laurel Creek Litigation) brought by The Townhomes at Laurel Creek Country Club Condominium Association, Inc. (the

---

[3]   Schuylkill's position with respect to the State Auto and Erie policies is unknown.  There are no cross-claims asserted by any defendant.  However, State Auto asserts that Schuylkill has never demanded coverage from it.

"Laurel Creek Plaintiffs").[4]  The Laurel Creek Plaintiffs seek compensation for many asserted defects in their property,[5] which were allegedly caused by the defective design, construction and workmanship of the various defendants to the litigation.

Schuylkill first became involved in the Laurel Creek Litigation on December 16, 2005, when Bell Supply Company ("Bell Supply"), an original defendant to the action, filed a third-party complaint against Schuylkill.  (Shah Aff. Ex. 2)  The Laurel Creek Plaintiffs allege that Bell Supply "supplied the materials for the stone fascia and other materials utilized in the construction of the Laurel Creek Carriage homes in question." (Id.)  Bell Supply, in its third-party complaint, seeks contribution and indemnification from Schuylkill.  (Id.)  The Bell Supply third-party complaint makes no allegations about Schuylkill's relationship to Bell Supply, nor any allegations about Schuylkill's involvement in the events and circumstances that gave rise to the Laurel Creek Litigation.[6]

Sometime after Bell Supply filed its third-party complaint,

_____

[4]  The suit was initiated on October 25, 2005.

[5]  The luxury development was built in 1996 and 1997 in Moorestown, New Jersey.  (Shah Aff. Ex. 2)

[6]  Bell Supply also named Eldorado Stone, LLC ("Eldorado"), and Ed Murphy ("Murphy") as third-party defendants, seeking contribution and indemnification from them, as well.  (Id.) Eldorado and Murphy subsequently asserted cross-claims for contribution and indemnification against Schuylkill. (Shah Aff. Ex. 3, 4)

-4-

the Laurel Creek Plaintiffs amended their complaint to include Schuylkill as a direct defendant.[7]  The Laurel Creek Complaint makes no specific allegations as to Schuylkill, except to allege that, "[a]t all times relevant herein, Schuylkill Stone Inc., was a manufacturer and/or distributor of the materials utilized in the construction of the stone fascia of the Laurel Creek Carriage Homes in question."  (Shah Aff. Ex. 2)  Judgment is demanded against "Defendants" (one of which is Schuylkill) for damages arising from: (1) breach of the implied warranty of habitability; (2) breach of the implied duty of good workmanship; (3) breach of the duty to exercise reasonable care in the design and construction of the homes;[8] and (4) "failure to properly design and/or manufacture the products listed herein which were used on the premises of Laurel Creek, and failed to adequately warn foreseeable users of the potential dangers of these products." (Id.)[9]  This last portion of the complaint seems to be

---

[7]  The record before this Court does not contain all of the pleadings from the Laurel Creek Litigation.  The Court has a copy of the initial complaint and the second amended complaint, but not the first amended complaint.  It is not clear whether Schuylkill became a direct defendant to the claims asserted by the Laurel Creek Plaintiffs in the first amended complaint or the second amended complaint.  The resolution of this factual issue, however, is not necessary to the disposition of the present motions.

[8]  Among other things, the Laurel Creek Complaint asserts that the homes did not comply with applicable building codes.

[9]  Other claims are asserted solely against Toll Brothers, Inc., the general contractor who built the homes, but those

referencing the list of all the alleged problems with the Laurel Creek properties.  (Id.)  The only item that appears to have any connection to Schuylkill is ¶ 13, m.: "the stone fascia located on the outside of all the homes is deteriorating."

The Insurance Policies at Issue

All three insurance companies (Plaintiff Wausau, Defendant State Auto, and Defendant Erie) agree that their Commercial General Liability ("CGL") policies have the same provisions and exclusions, but differ with respect to policy periods.

In 2003, Environmental Materials, LLC ("Environmental Materials"), purchased CGL insurance from Plaintiff Employers Insurance Company of Wausau, with a policy period of April 1, 2003, to April 1, 2004.  (Shah Aff. Ex. 7)  Schuylkill was named an additional insured under the policy. (Id.)  The following year, 2004, Environmental Materials purchased another CGL policy from Plaintiff Wausau Underwriters Insurance Company, with a policy period of April 1, 2004, to April 1, 2005.  (Shah Aff. Ex. 8)  Schuylkill was named an additional insured under that policy as well.  (Id.)  The Wausau policies' relevant terms, quoted and discussed *infra*, are identical to each other.

In 1999, 2000, and 2001, State Auto issued CGL policies to Schuylkill with policy periods of May 10, 1999, to May 10, 2000;

_____

claims are not relevant to the instant case.

May 10, 2000, to May 10, 2001; and May 10, 2001, to May 10, 2002, respectively.  (Shah Aff. Ex. 10-12)[10]  The State Auto policies' relevant terms, quoted and discussed *infra*, are identical to each other and are, in all substantive respects, identical to the Wausau policies' terms.[11]

In 1993, Erie issued CGL insurance to Schuylkill, with an inception date of May 10, 1993, and a cancellation date of May 10, 1999.  (Shah Aff. Ex. 19)  The Erie policy's relevant terms, quoted and discussed *infra*, are identical to the Wausau policies' terms and State Auto policies' terms.

The Initiation of this Federal Suit

Sometime after Bell Supply filed its third-party complaint against Schuylkill, Wausau began defending Schuylkill under a

---

[10]  The record contains only "specimen" copies of the State Auto policies which are not the actual policies issued to Schuylkill.  However, no party objects to the "specimens" nor does anyone dispute the relevant terms of the State Auto policies.

[11]  Wausau and State Auto agree that there is no substantive difference between their policies' language; there is an extra "and" in a subparagraph of the State Auto policies, but it does not alter the meaning of the policy terms.  (State Auto's response to Wausau's Statement of Undisputed Facts ¶¶ 26-32) Both parties used the same Commercial General Liability Coverage Form, created by Insurance Services Office, Inc. ("ISO"), when writing their policies with Schuylkill.  (Id. at ¶ 26) *See generally,* 20-129 Appleman on Insurance § 129.2[I][9] ("As is the custom in the insurance industry, liability insurance policies are generally mass standardized through voluntary cooperation of liability insurers in using ISO forms.").

-7-

complete reservation of rights.  At the same time, Wausau wrote to State Auto and Erie, tendering the defense to them.  (Shah Ex. 13)  Neither company accepted the tender of defense.  Both companies responded that their policies did not cover the Laurel Creek Litigation because there was no "occurrence" (as defined in the policies) that would trigger coverage, and because the alleged loss occurred outside the policy periods.  (Shah Ex. 14, 21)

A few months later, Wausau filed the present suit, asserting three claims against State Auto and Erie, and asserting two claims against Schuylkill.  Against State Auto and Erie, Wausau seeks: (1) a declaratory judgment that State Auto and Erie are required to participate in the defense of, and to indemnify Schuylkill in the Laurel Creek Litigation (Count 1 of the Complaint); (2) damages for State Auto's and Erie's proportionate share of Laurel Creek Litigation defense costs (Count 2); and (3) attorneys fees and costs arising out of this coverage litigation, pursuant to N.J. Ct. R. 4:42-9(a)(6) (Count 3).  Against Schuylkill, Wausau seeks: (1) a declaratory judgment that Wausau is not obligated to defend or indemnify Schuylkill in the Laurel Creek Litigation (Count 4); (2) damages resulting from Wausau's alleged unjust enrichment of Schuylkill by providing Schuylkill with a defense in the Laurel Creek Litigation, when Wausau was allegedly under no duty to do so (Count 5).

All three insurance companies move for summary judgment. Schuylkill moves for partial judgment on the pleadings and to stay a portion of this litigation pending the outcome of the Laurel Creek Litigation.  For the reasons set forth below, the Court will grant Schuylkill's Motion to Stay, stay the issue of Schuylkill's indemnification as between the various insurers, and deny all remaining motions to the extent not stayed.

## II.

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the nonmoving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Conoshenti v.*

*Pub. Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 325).  The role of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The summary judgment standard is not affected when the parties file cross-motions for summary judgment. *See Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987).  Such motions "'are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'"  *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).  If after review of cross-motions for summary judgment the record reveals no genuine issues of material fact, then judgment will be entered in favor of the deserving party in light of the law and undisputed facts.  *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998).

**III.**

**A.**

Before reaching the merits of the parties' disputes, the Court must address the question of its personal jurisdiction over Erie.  Erie previously raised its personal jurisdiction defense in a Rule 12(h) motion, but the Court denied the motion without prejudice to its renewal, pending jurisdictional discovery.  Now Erie renews its objection in its cross-motion for summary judgment.[12]

The basic and familiar legal framework concerning personal jurisdiction was laid out in this Court's previous opinion,[13] and

---

[12]  Contrary to Wausau's argument, Erie has not waived its personal jurisdiction defense by filing its cross-motion for summary judgment.  The single case relied upon by Wausau, *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435 (3d Cir. 1999), is readily distinguishable.  The defendant in *Chemrite* moved for summary judgment on its own counterclaim without filing a prior motion to dismiss.  The defendant then moved to dismiss for lack of personal jurisdiction after filing the summary judgment motion.  Here, Erie moved for dismissal pursuant to Rule 12(h) before moving for summary judgment on Wausau's claim against it.  *Chemrite* merely stands for the proposition that seeking affirmative relief on one's own claims prior to pressing the jurisdictional objection waives personal jurisdiction.  That is not what occurred in this case.  *See Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.),* 197 F. Supp. 2d 86, 92 (D. Del. 2002)(distinguishing *Bel-Ray*, noting that the *Bel-Ray* defendants "actively requested relief from the Court and litigated their counterclaims through full briefing prior to securing a determination on their personal jurisdiction defense.").

[13]  *Wausau Underwriters Ins. Co. et al. v. State Automobile Mutual Ins. Co. et al.,* No. 07-1316, 2007 WL 4232962 at *3 (D.N.J. Nov. 30, 2007)(Fed. R. Civ. P. 4(e)(1) permits this Court's exercise of personal jurisdiction to the extent

-11-

need not be repeated here.

The issue, as stated in the prior opinion, is whether Erie issued to Schuylkill a policy "which affords some kind of coverage for events occurring in New Jersey where issues of liability or coverage are being litigated in New Jersey." *Wausau Underwriters,* 2007 WL 4232962 at *4. Erie admits that it "issued [to Schuylkill] a policy of insurance including a territory of coverage clause that includes New Jersey."[14] Accordingly, the only remaining question is whether "a forum related event" has occurred in this case. *Waste Mgmt., Inc. v. Admiral Ins. Co.*, 138 N.J. 106, 128 (1994); *see also New Jersey Auto. Full Ins. Underwriting Ass'n v. Indep. Fire Ins. Co.*, 253 N.J. Super. 75 79-80 (1991).

This Court stated in its previous opinion, "[c]learly, the underlying dispute concerning the construction project of homes in New Jersey is a forum related event." *Wausau Underwriters,* 2007 WL 4232962 at *4. Erie disagrees, reasoning that the Laurel Creek Litigation involves an alleged manufacturing defect in

---

authorized by New Jersey law; New Jersey's long-arm statute is coterminous with the bounds of the Due Process Clause of the 14th Amendment; the 14th Amendment requires minimum contacts and an assertion of jurisdiction that comports with notions of fair play and substantial justice).

[14] *See* Erie's Brief in Opposition to Wausau's Motion for Summary Judgment and in Support of Erie's Cross-Motion for Summary Judgment, p. 7. The relevant policy states, "This policy applies . . . within the United States of America, its territories or possessions, Puerto Rico or Canada." Id.

Schuylkill's stone fascia.  According to Erie, "[t]he stone at issue was manufactured and sold in Pennsylvania, and brought to New Jersey by parties other than Schuylkill Stone."  Erie's Reply Br. at p. 4.[15]  Erie distinguishes *New Jersey Auto*, explaining that the insured in that case was physically present in New Jersey when the underlying car accident occurred.

The Court is not persuaded.  The *New Jersey Auto* court explained that the minimum contacts requirement was satisfied in that case "by [the defendant-insurer's] contractual commitment to its insured, the happening of the accident in New Jersey and the third party claims which that accident generated."[16]  253 N.J. Super. at 84.  As just explained, Erie concedes the first and third factors, disputing only that in this case there is, in effect, no "accident" (i.e., event) in New Jersey.  The distinction Erie makes, however, is false, resulting only from the differing factual nature of automobile accidents, on one hand, and injuries caused by allegedly defective products on the other.

---

[15]  See also, Erie's Brief in Opposition to Wausau's Motion for Summary Judgment and in Support of Erie's Cross-Motion for Summary Judgment, p. 7 ("The stone which is alleged to have defects came to New Jersey by way of either a California based corporation or a New Jersey based distributor, and not through any direct contact between Schuylkill Stone and New Jersey.").

[16]  Notably, the presence of the insured within the forum is not a factor.  Both *New Jersey Auto* and *Waste Management* speak of a forum related *event*, not the insured's presence in the forum.

*New Jersey Auto* holds that personal jurisdiction over an insurer "derives from its contractual obligation to indemnify and defend its insured, a duty that foreseeably required litigation *in any forum where the insured risk traveled*." *Domtar, Inc. v. Niagara Fire Ins. Co.*, 533 N.W.2d 25, 32 (Minn. 1995), *cert. denied*, 516 U.S. 1017 (1995)(emphasis added).[17]  The insured risk in *New Jersey Auto* was the car accident.  The insured risk here is property damage allegedly caused by Schuylkill's product. Both the car accident and the alleged property damage occurred in New Jersey.

The fact that the insured driver in *New Jersey Auto* was physically present in New Jersey when the accident occurred does not have the analytical significance that Erie ascribes to it. The insured driver was a Florida resident.  *New Jersey Auto,* 253 N.J. Super. at 77.  If the exercise of personal jurisdiction over a Florida insurance company insuring a Florida resident who causes an accident in New Jersey is permissible, the same result should obtain with respect to a Pennsylvania insurance company (Erie) insuring a Pennsylvania business (Schuylkill) which

---

[17]  In *Domtar,* the Minnesota Supreme Court upheld the assertion of personal jurisdiction over Domtar's Canadian insurance company in Domtar's suit seeking a declaration that its insurance company was obliged to defend and indemnify Domtar in litigation involving the clean-up of environmentally contaminated property in Duluth, Minnesota.  (Minnesota's long arm statute permits the exercise of personal jurisdiction to the extent allowed by the 14th Amendment. *See Domtar*, 533 N.W.2d at 29.)

allegedly caused property damage in New Jersey by manufacturing an allegedly defective product (the stone fascia).[18]

In contrast, *Waste Management* held that New Jersey courts could not constitutionally assert jurisdiction over a Canadian insurance company insuring a polluted site in Canada.  The significant event-- the pollution of the land-- occurred in Canada, not the forum (New Jersey).  *Waste Management* would preclude this Court's exercise of jurisdiction over Erie if the stone fascia were installed on a building in Pennsylvania (or anywhere other than New Jersey for that matter), because the significant event would have occurred outside of New Jersey.

Thus, the Court concludes that Erie has sufficient minimum contacts to support specific personal jurisdiction over it. Additionally, Erie makes no argument that the assertion of personal jurisdiction would not comport with notions of fair play and substantial justice,[19] and the Court concludes that the

---

[18]   *See Se. Express Sys. v. S. Guaranty Ins. Co. of Ga.*, 34 Cal. App. 4th 1, 9 (1995)(finding no meaningful distinction between automobile liability insurers and commercial liability insurers in the personal jurisdiction analysis, explaining, "[b]oth insurers of rambling automobiles and insurers of interstate business should reasonably anticipate being called into foreign forums.")(California's long arm statute permits the exercise of personal jurisdiction to the extent allowed by the 14th Amendment. *Id.* at 5).

[19]   *See supra,* n.13.

assertion of jurisdiction is fair.[20]

Accordingly, the Court holds that it may constitutionally exercise specific jurisdiction over Erie in this coverage dispute.[21]  Erie's personal jurisdiction motion will be denied.

**B.**

Schuylkill's Motion to Stay the litigation of Count 4 with respect to indemnity only[22] will be granted because Wausau does not oppose the Motion.  Moreover, if Schuylkill is not found liable in the Laurel Creek Litigation, the issue of Wausau's duty to indemnify Schuylkill will become moot.[23]  Accordingly, the

---

[20]  *See Lebel v. Everglades Marina, Inc.*, 115 N.J. 317, 328 (1989) ("a nonresident defendant who has been found to have minimum contacts with the forum 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.' *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184, 85 L.Ed.2d at 544. This determination requires evaluation of such factors as the burden on the defendant."). The Complaint alleges that Erie is incorporated in Pennsylvania, with a principal place of business in New York.  The Court finds that litigating this case in New Jersey is not unfairly burdensome to Erie.

[21]  In light of this holding, the Court need not address Wausau's assertion that Erie's motion should be denied because Wausau needs more discovery as to Erie's New Jersey contacts which might support general jurisdiction.

[22]  Schuylkill does not seek a stay as to the question of Wausau's duty to defend.

[23]  *See U.S. v. Pennsylvania*, 923 F.2d 1071, 1075-76 (3d Cir. 1991)(noting three factors that weigh in favor of staying a federal declaratory judgment suit seeking a declaration regarding an insurance company's duty to indemnify: "(1) the general policy of restraint when the same issues are pending in state court; (2)

Court concludes that a stay is appropriate.

## C.

With respect to the remainder of the issues in dispute between Wausau and Schuylkill-- the duty to defend portion of Count 4, and Count 5 (unjust enrichment resulting from Wausau's defense of Schuylkill)-- Schuylkill asserts that it is entitled to a judgment in its favor. Wausau cross-moves for summary judgment against Schuylkill.

Procedural issues aside,[24] the merits question is whether

---

an inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize, in the federal suit, the state court suit as arising under a policy exclusion; and (3) an avoidance of duplicative litigation.").

[24] Schuylkill moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), asserting that, to decide the coverage issue, the Court need only look to the pleadings in the Laurel Creek Litigation (of which this Court may take judicial notice) and the terms of the Wausau policies. There is authority to suggest that the Court would be able to look to those documents on a Rule 12(c) motion, even though strictly speaking, it would be considering materials outside of pleadings because the Wausau policies are not quoted in the Complaint, nor are they attached to the Complaint. *See CitiSteel USA, Inc. v. GE,* 78 F. App'x 832, 835 (3d Cir. 2003) ("Merely attaching documents to a Rule 12(c) motion . . . does not convert it to a motion under Rule 56. In ruling on a motion to dismiss, a trial court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. . . . Further, in ruling on the motion a court generally has discretion to address evidence outside the complaint.")(internal citations and quotations omitted). In any event, Wausau's Cross-Motion for Summary Judgment resolves any procedural questions and this Court need not decide whether to convert Schuylkill's Motion into a motion for summary judgment. *See generally* 2-12 Moore's Federal Practice - Civil § 12.38 ("All

there is coverage under either of the Wausau policies.  Wausau
asserts two arguments.  First, it claims that there was no
"occurrence" or "property damage," as defined by the Wausau
policies, or alternatively, an exclusion applies, and therefore
there is no coverage.  Second, it claims that the damages caused
by Schuylkill's allegedly defective product first manifested
themselves before the inception of Wausau's policies, and
therefore there can be no coverage.

Under Pennsylvania law,[25] "'the obligation to defend an
action brought against the insured is to be determined solely by
the allegations of the complaint in the action.' . . . Thus, the
insurer's duty to defend is limited to only those claims covered
by the policy." *Gen. Accident Ins. Co. of Am. v. Allen,* 547 Pa.
693, 704 (1997)(quoting *Wilson v. Md. Casualty Co.*, 377 Pa. 588,
595 (1954)).  "[T]he particular cause of action that a
complainant pleads is not determinative of whether coverage has
been triggered.  Instead it is necessary to look at the factual

---

parties must receive notice of the conversion and a reasonable
opportunity to present all material made pertinent to the motion
by Rule 56. The essential inquiry, when determining if the
district court correctly converted a motion to dismiss into a
motion for summary judgment, is whether the nonmovant should
reasonably have recognized the possibility that the motion might
be converted into one for summary judgment or was taken by
surprise and deprived of a reasonable opportunity to meet facts
outside the pleadings.")(internal citations and quotations
omitted).

[25]  All parties agree that Pennsylvania law applies.

allegations contained in the complaint." *Mut. Benefit Ins. Co. v. Haver*, 555 Pa. 534, 538 (1999).[26] The Court construes the factual allegations of the underlying complaint liberally in favor of the insured. *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999) (citing *Biborosch v. Transamerica Ins. Co.*, 412 Pa. Super. 505 (1992)).[27] "An insurer's duty to defend an insured in litigation is broader than the duty to indemnify, in that the former duty arises *whenever an underlying complaint may potentially come within the insurance coverage*." *Id.* (emphasis added).[28]

---

[26] *See also Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Comm. Union Ins. Co.*, 589 Pa. 317, 331 (2006) ("we hold that the Superior Court's approach in looking beyond the [underlying] complaint was in error. Instead, we will look to the language of the policies themselves to determine in which instances they will provide coverage, and then examine [the underlying] complaint to determine whether the allegations set forth therein constitute the type of instances that will trigger coverage.")(citing *Allen*, *Wilson*, and *Haver*).

[27] *See also Lucker Mfg. v. The Home Ins. Co.*, 23 F.3d 808, 814 (3d Cir. 1994) ("The underlying complaint need not track the policy language for there to be coverage: Lucker's complaint needed only to indicate the type of litigation involved so that the defendant would have fair notice of the claim and its defenses.").

[28] *See also Berg Chilling Sys. v. Hull Corp.*, 70 F. App'x 620, 624 (3d Cir. 2003). ("Pennsylvania's courts have taken a relatively broad view in discerning whether a complaint triggers the insurer's duty to defend."); *Unionamerica Ins. Co. v. Nufab Corp.*, 30 F. App'x 30, 35 (3d Cir. 2002) (reversing the district court's grant of summary judgment in favor of the insurer, holding, "[t]he allegations in the complaint at the very least *potentially fall within the policy's coverage* and obligate the insurance company to defend.")(emphasis added).

The Laurel Creek Complaint asserts:

The design, construction and workmanship at the condominiums at Laurel Creek is defective, improper, utilized inappropriate materials and/or poor workmanship including but not limited to, the following:

. . .

    m. the stone fascia located on the outside of all of the homes is deteriorating

. . .

. . . The construction defects described herein, although not immediately apparent, existed when these homes were built and sold by the defendants . . .

. . .

Defendants failed to properly design and/or manufacture the products listed herein which were used on the premises of Laurel Creek, and failed to adequately warn foreseeable users of the potential dangers of these products . . .

As a result of inadequate design, manufacture and inadequacy of the warnings, the condominium owners represented by the plaintiff suffered or are at risk to suffer damage to their personal property regarding both the personal property itself as well as to surrounding areas in effecting a repair of the defective product, and will also suffer a diminution in the overall property value of their homes.

(Shah Ex. 1)

The Wausau policies state:

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.  Insuring Agreement

     a.  We will pay those sums that the insured
becomes legally obligated to pay as damages because
of "bodily injury" or "property damage" to which
this insurance applies.  We will have the right and
duty to defend the insured against any "suit"
seeking those damages.  However, we will have no
duty to defend the insured against any "suit"
seeking damages for "bodily injury" or "property
damage" to which this insurance does not apply. . .

     b.  This insurance applies to "bodily injury"
and "property damage" only if:

     (1) The "bodily injury" or "property damage" is
caused by an "occurrence" that takes place in the
"coverage territory"; [and]

     (2) The "bodily injury" or "property damage"
occurs during the policy period. . .

(Shah Aff. Ex. 7)  The policies define "property damage" as,

     a.  Physical injury to tangible property, including
all resulting loss of use of that property.  All
such loss of use shall be deemed to occur at the
time of the physical injury that caused it; or

     b.  Loss of the use of tangible property that is not
physically injured.  All such loss of use shall be
deemed to occur at the time of the "occurrence" that
caused it.

"Occurrence" is "an accident, including continuous or repeated

exposure to substantially the same general harmful conditions."

(Id.)


**(1)  <u>Coverage under the Wausau policies</u>**

    The first issue is a matter of contract interpretation: does

the Laurel Creek Complaint allege "property damage" resulting

from an "occurrence," as those terms are used in the Wausau

policies?  And if so, do any exclusions preclude coverage?  The Court must

> ascertain the intent of the parties as manifested by the terms used in the written insurance policy. When the language is clear and unambiguous [the Court] must give effect to that language.  However, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured.

*Donnegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)(internal citations and quotations omitted).

*(a.) Does the Laurel Creek Complaint allege an "occurrence"?*

Neither Schuylkill nor Wausau asserts that the relevant terms are ambiguous, and the Pennsylvania Supreme Court has addressed the same CGL insurance terms, giving them their ordinary meaning, without finding any ambiguity.  *See Baumhammers*, 938 A.2d at 292; *Kvaerner*, 589 Pa. at 332-33. Accordingly, the Court will proceed to apply the ordinary meanings of the words, as found by the Pennsylvania Supreme Court.

The Wausau policies define "occurrence" as an "accident." "Accident," as ordinarily used, is "'an unexpected and undesirable event, or something that occurs unexpectedly or unintentionally.'"  *Kvaerner*, 589 Pa. at 333 (quoting Webster's II New College Dictionary).  "The key term in the ordinary definition of 'accident' is 'unexpected.'  This implies a degree of fortuity."  *Id.; see also Baumhammers*, 938 A.2d at 292

("'accident' within insurance policies refers to an unexpected and undesirable event occurring unintentionally, . . . unexpected [] implies a degree of fortuity."). "An injury [or property damage] therefore is not 'accidental' if [it] was the natural and expected result of the insured's actions." *Baumhammers*, 938 A.2d at 292. Whether the injury or damage is accidental (i.e., is sufficiently fortuitous and unforeseeable) is determined from the perspective of the insured. *Id.* at 293.[29]

In applying this definition to the instant case, *Kvaerner*, which held that an "accident" was not pled in the underlying complaint, and *Baumhammers,* which held that an "accident" was pled, are helpful guideposts.

In *Kvaerner*, the insured contracted with a third party to design and construct a coke oven battery. 589 Pa. at 321-22. When many alleged defects were discovered in the insured's work,[30] the third party sued the insured, in a breach of contract action, for the replacement value of the battery or the

---

[29] *See also Nationwide Mut. Fire Ins. Co. of Columbus, OH v. Pipher*, 140 F.3d 222, 226 (3d Cir. 1998)("It is well established that the test of whether the injury or damage is caused by an accident must be determined from the perspective of the insured.")(discussed with approval in *Baumhammers*).

[30] Apparently, a coke oven battery is used in making steel. The underlying complaint asserted 16 different technical defects mainly having to do with the brickwork done in constructing the battery. *See, e.g., Kvaerner*, 589 Pa. at 322 ("'100% of the ovens have cracked paver bricks' and 'shifting brickwork has caused maximum deviation of centerlines of flue inspection ports'").

difference in value between what was warranted under the contract and the defective battery. *Id.* at 322.  The insurer denied coverage and the insured sought a declaratory judgment that the insurer had a duty to defend and indemnify under the applicable CGL policy. *Id.* at 324.  The Pennsylvania Supreme Court concluded that no accident, and therefore no occurrence, was pled in the underlying complaint.  Interpreting the complaint to assert breach of contract claims based on faulty workmanship, the court explained that the factual allegations lacked the "degree of fortuity" required by the definition of "accident." *Id.* at 333.  The court further elaborated,

> provisions of a general liability policy provide coverage if the insured work or product actively malfunctions, causing injury to an individual or damage to another's property.  Contractual claims of poor workmanship [do] not constitute the active malfunction needed to establish coverage under the policy.

*Id.* (internal citations omitted).

On the other hand, the Pennsylvania Supreme Court in *Baumhammers* held that an accident had occurred, and therefore the insurance company was required to defend the underlying suit.  In that case, the underlying suit was a negligence claim against the parents of an adult son who killed five people and injured a sixth. *Baumhammers*, 938 A.2d at 288.  The insurance company sought a declaration that they were not required to defend or

indemnify the parents under their homeowners' insurance policy,[31] asserting that the intentional act of killing five people and injuring another was not an "accident."  *Id.*  The underlying complaint asserted negligence on the part of the parents, in failing to take away their son's gun and failing to alert mental health professionals or law enforcement about his dangerous propensities.  *Id.* at 291.  In holding that an "accident" had occurred, the court explained, "'the test of whether an injury is a result of an accident is to be determined from the viewpoint of the insured and not from the viewpoint of the one that committed the act causing the injury.'"  *Id.* at 292.  Applying *Kvaerner*'s definition of "accident," the court further concluded that

> the claims asserted by Plaintiff present the degree
> of fortuity contemplated by the ordinary definition
> of 'accident.' . . . The extraordinary shooting
> spree . . . resulting in injuries to Plaintiffs
> cannot be said to be the natural and expected result
> of Parents alleged acts of negligence.  Rather,
> Plaintiffs' injuries were caused by an event so
> unexpected, undesigned and fortuitous as to qualify
> as accidental within the terms of the policy.

*Id.* at 293.

This Court faces the difficult task of determining whether the instant case is more like *Kvaerner* or *Baumhammers*.  Not surprisingly, Wausau argues that this case is clearly a case of

---

[31]   The policy defined an "occurrence" as an "'accident, including repeated exposure to substantially the same harmful conditions, which results, during the policy period in . . . bodily injury or property damage.'"  *Baumhammers*, 938 A.2d at 289.

faulty workmanship as in *Kvaerner*, and it is well-settled that claims for faulty workmanship are not claims resulting from an "accident."  But this case is different than *Kvaerner*, and other similar faulty workmanship cases,[32] because Schuylkill had no contractual relationship with the Laurel Creek Plaintiffs (at least the Laurel Creek Complaint alleges no such relationship), and the underlying claims are not for breach of contract.[33]  Such a distinction is meaningful because the insured in *Kvaerner* specifically agreed in the contract "to build the Battery according to certain plans and specifications that were made part of the contract, warranted that its materials, equipment, and work would be free from defect, and agreed to repair or replace any defective work or materials." 589 Pa. at 322.  Under these facts, it can hardly be said that the insured's failure to perform up to its own bargained-for, self-imposed standards was fortuitous from the insured's point-of-view.

While the Laurel Creek Complaint also asserts breach of warranty, there is nothing in the complaint to suggest that such a warranty arises out of a contractual agreement between

─────────────

[32]  *See, e.g.,* cases discussed in *Kvaerner*, 589 Pa. at 333-35.

[33]  Wausau argues that this court should apply the "gist of the action" doctrine to conclude that the Laurel Creek Litigation is really a contract dispute.  The doctrine is not applicable in this case.  The underlying complaint alleges no contract between the Laurel Creek Plaintiffs and Schuylkill.

Schuylkill and the Laurel Creek Plaintiffs.  Rather, it would
appear that the warranty which allegedly has been breached is a
warranty implied by law.  The alleged damage in this case does
not result from Schuylkill's alleged failure to live-up to
standards for which it bargained and established itself.[34]  Under
these circumstances, it is more difficult to conclude that the
damage caused by Schuylkill's alleged failures was not
fortuitous.[35]

------

[34] *See generally Cipollone v. Liggett Group, Inc.*, 893 F.2d
541, 571 (3d Cir. 1990) ("Implied warranties involve societal
standards imposed by law. Express warranties involve standards
that the seller promises to deliver. . . . [I]mplied warranties
hold sellers responsible for legally imposed duties of care.");
*Williams v. Hilton Group PLC*, 93 F. App'x 384, 386 (3d Cir. 2004)
("Tort actions lie for breaches of duties imposed by law as a
matter of social policy, while contract actions lie only for
breaches of duties imposed by mutual consensus agreements between
particular individuals.");  *see also* Restatement (Third) of
Torts: Products Liability, § 1, "Liability of Commercial Seller
or Distributor for Harm Caused by Defective Products," comment a.
("The liability established in this Section draws on both
warranty law and tort law. Historically, the focus of products
liability law was on manufacturing defects. A manufacturing
defect is a physical departure from a product's intended design.
. . . Courts early began imposing liability without fault on
product sellers for harm caused by such defects, holding a seller
liable for harm caused by manufacturing defects even though all
possible care had been exercised by the seller in the preparation
and distribution of the product. In doing so, courts relied on
the concept of warranty, in connection with which fault has never
been a prerequisite to liability.").

[35] Consider an automobile collision resulting from a
driver's negligence.  Such an "accident" results from the
driver's failure to live up to the ordinary standard of care
imposed by law.  *See* Black's Law Dictionary (8th ed. 2004)
("negligence, n. 1. The failure to exercise the standard of care
that a reasonably prudent person would have exercised in a
similar situation; any conduct that falls below the legal

The Court cannot, based solely on the sparse factual allegations of the Laurel Creek Complaint, rule-out the possibility that the alleged manufacturing or design defect in the stone fascia resulted from Schuylkill's negligence.  In this regard, the instant case is not so different from *Baumhammers* as one might conclude at first blush.  Although *Baumhammers* was a much clearer case of an accident from the insureds' perspective, the underlying complaint alleged negligence of the insureds. *Baumhammers* generally holds that bodily injury (or property damage) allegedly caused by the negligent acts of the insured may be a sufficiently fortuitous event to constitute an "accident" and therefore an "occurrence."  Therefore, the allegations of the Laurel Creek Complaint may be interpreted to assert that the complained-of damage resulted from an "occurrence" under the Wausau policies.[36]

---

standard established to protect others against unreasonable risk of harm, except for conduct that is intentionally, wantonly, or willfully disregardful of others' rights.).

[36] The facts alleged in the Laurel Creek Complaint are similar to the facts alleged by the underlying complaint in *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.,* where the Fifth Circuit held that an insurance company had a duty to defend its insured. 197 F.3d 720 (5th Cir. 1999).  While the court applied Texas law to interpret the CGL policy at issue, the court's analysis helps to illustrate the concepts that can be gleaned from *Kvaerner* and *Baumhammer.*
    In *Grapevine*, the underlying complaint asserted that Grapevine, the insured, failed to use the specified fill materials in an excavation and backfilling project for a parking lot, causing damage to another contractor's work.  In reversing the district court's holding that the insurer had no duty to

Such a result is consistent with *Kvaerner.*  Just as the Court cannot rule-out the possibility that the alleged manufacturing or design defect resulted from Schuylkill's negligence, the Court must, at this time, conclude that the alleged manufacturing or design defect could constitute the type of "active malfunction" which would constitute an "accident"

---

defend, the Fifth Circuit explained,

> Although [Grapevine] readily admits that it intentionally performed under the subcontract, it denies that it intentionally substituted inferior materials-- and nothing in the facts alleged [in the underlying complaint] supports a claim of knowing or intentional substitution of inferior fill matter. . . . [The underlying complaint] alleges that [Grapevine] acted negligently-- that is, 'caused damage which is undesigned and unexpected'-- which, if proved to be true, constitutes an 'accident.' . . . Had the only allegations against [Grapevine] accused it of knowingly and willfully choosing and using substandard material that damaged the paving, and doing so to cut corners or gain unearned profit, [Grapevine would not be entitled to a defense].  As [the underlying complaint's] allegations against [Grapevine] include negligence, however, [Grapevine is entitled to a defense].

*Grapevine*, 197 F.3d at 726, 730.
    While the Laurel Creek Complaint does not suggest why the stone fascia are deteriorating, presumably the manufacturing or design defect complained of has something to do with the materials Schuylkill used to make the stone fascia.  To the extent that the Laurel Creek Complaint seeks compensation for damages resulting from Schuylkill's alleged failure to select materials that would not "deteriorate," nothing in the complaint suggests that Schuylkill intentionally chose defective materials. Accordingly, the complaint alleges damage that resulted from an accident.

under *Kvaerner*.  589 Pa. at 333.[37]

The conclusion that the Laurel Creek Complaint asserts an "occurrence," however, does not end the analysis.  Accordingly, the Court turns to the next inquiry.

### (b.) *Does the Laurel Creek Complaint allege "property damage"?*

Under the Wausau policies, the occurrence must cause "property damage," which is defined as, "physical injury to tangible property, including all resulting loss of use of that property" or "loss of the use of tangible property that is not physically injured."[38]

Wausau and Schuylkill generally agree that the Wausau policies do not cover damage to Schuylkill's own product, the stone fascia.  Indeed, under the plain language of the policies, the mere allegation that the stone fascia are deteriorating does not trigger coverage.  Schuylkill, however, interprets the Laurel Creek Complaint as alleging damage to other property as well, whereas Wausau insists that the complaint does not allege any damage to other property.

---

[37] Perhaps the evidence in the Laurel Creek Litigation will show otherwise, but that is only relevant to whether Wausau has a duty to indemnify Schuylkill, an issue which the Court does not decide today.

[38] As with the above discussion about an "occurrence" under the Wausau policies, neither Schuylkill nor Wausau assert that any of these terms are ambiguous, and the Court concludes that they are not ambiguous.

As quoted above, the Laurel Creek Complaint seeks
compensation for "damage to [plaintiffs'] personal property
regarding both the personal property itself as well as to
surrounding areas in effecting a repair of the defective product,
and will also suffer a diminution in the overall property value
of their homes."  Read as a whole, the complaint apparently
asserts that the deteriorating stone fascia has: (1) damaged
unspecified personal property; and (2) decreased the value of the
Laurel Creek Plaintiffs' homes, although how (1) or (2) has come
about is not explained in the complaint.[39]  The complaint can
also be reasonably interpreted as alleging (3) damage to other
property in repairing or replacing the allegedly defective stone
fascia.

Given only the general allegations of the complaint, the

---

[39]  Both Wausau and Schuylkill rely on facts developed during
discovery in the Laurel Creek Litigation to support their
interpretation of the Laurel Creek Complaint's allegations.
Wausau asserts that the Laurel Creek Plaintiffs merely complain
of an "ornamental" problem with the stone fascia (i.e., the
deteriorating stone is not pleasing to the eye), while Schuylkill
claims that the stone fascia are meant to protect underlying
house structures from the elements, but are not doing so.
However, Pennsylvania law is clear that this Court must limit
itself to examining the facts pled in the underlying complaint
when determining the insurer's duty to defend.  *Cf. Westfield
Group v. Campisi*, No. 02-997, 2006 U.S. Dist. LEXIS 24731 at *5
(W.D. Pa. Feb. 10, 2006)("The duty [to defend] exists where the
potential for a covered claim exists and the determination of
coverage depends upon the existence or non-existence of
undetermined or disputed facts raised against the
insured.")(citing *Germantown Ins. Co. v. Martin,* 407 Pa. Super.
326, 595 A.2d 1172, 1174 (Pa. Super. 1991)).

Court must interpret them to assert "property damage." With respect to (1), it seems possible that the deteriorating stone fascia could cause "physical damage to tangible property" other than the stone fascia itself; in particular, it seems quite possible that deteriorating stone fascia affixed to a structure could cause physical damage to other parts of that structure. Similarly, as to (3), it is certainly possible that repairing or replacing the stone fascia could cause physical damage to other tangible property.

With respect to (2), the issue is whether a decrease in the homes' value, which is not physical damage to tangible property, is nonetheless "property damage" under the "loss of use" definition. While Schuylkill relies on *Lucker Manufacturing v. The Home Ins. Co.*[40] to argue that it is, the Court need not decide the issue given the Court's conclusion that the Laurel Creek Complaint independently alleges damage to tangible property other than the stone fascia itself.[41]

---

[40]  23 F.3d 808 (3d Cir. 1994)(Becker, J.)(applying Pennsylvania and Wisconsin law).

[41]  While *Lucker* interpreted the same CGL policy terms that are at issue here, its facts are quite different from the instant case. The *Lucker* court concluded that lost "use" encompasses not only lost physical use, but also lost non-physical or economic use, *Lucker*, 23 F.3d at 815, but it is not clear that the general holding would extend as far as to cover the diminution of value alleged in the Laurel Creek Complaint. At the very least, so far as this Court's research has found, no other court has so extended *Lucker*. In *Lucker*, the change in customer demand, which was caused by the wrongful act of the insured, caused the loss of

Accordingly, the Court holds that the Laurel Creek Complaint alleges "property damage" as defined in the Wausau policies.

To recap and summarize the Court's analysis up to this point, the Court has now concluded that the Laurel Creek Complaint alleges "property damage" resulting from an "occurrence" because the complaint may be liberally but reasonably interpreted to allege that Schuylkill's negligent conduct in manufacturing or designing the stone fascia caused physical damage to tangible property other than the stone fascia itself.

### (c.) *Do any policy exclusions apply?*

Next, the Court must determine whether any of the policy exclusions preclude coverage.  Wausau relies on four exclusions. The Court will address each in turn.[42]

Exclusion j. indicates that the insurance policy does not apply to, "Damage to Property; 'Property damage' to: . . . (6) That particular part of any property that must be restored,

---

use to the underlying plaintiff "*which had no other use for the product other than selling it*."  *Id.* at 817 (emphasis added).  In other words, the underlying plaintiff lost *all* use for the product as a result of the insured's actions.  The same cannot be said in this case.

[42]  The insurer bears the burden of proving that an exclusion applies and the policy language is strictly construed against the insurer.  *Erie Ins. Exchange v. Transamerica Ins. Co.*, 516 Pa. 574, 580 (1987).

repaired or replaced because 'your work'[43] was incorrectly performed on it."  (Shah Aff. Ex. 7)  Wausau gives no explanation why this exclusion should apply, other than asserting that this exclusion, along with several others, "preclude[s] coverage for inferior materials such as defective stone fascia."  However, this Court has already concluded that the Laurel Creek Complaint does more than allege defective stone fascia.  While this exclusion might preclude coverage for the claim for the costs of repairing or replacing the stone fascia itself, it does not preclude coverage for claims seeking the costs associated with repairing the other unspecified personal property alleged to have been damaged by the stone fascia.  Exclusion j. does not preclude coverage.

Exclusion k. excludes coverage for "'property damage' to your product arising out of it or any part of it."  This exclusion does not preclude coverage for the same reasons exclusion j. cannot preclude coverage.  The Laurel Creek Complaint alleges more than just damage to the stone fascia

---

[43]  "Your work" is defined as "work or operations performed by you or on your behalf and materials, parts or equipment furnished in connection with such work or operations."  The definition expressly includes "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work,' and the providing of or failure to provide warnings or instructions."

itself.[44]

Exclusion m., entitled "Damage to Impaired Property or Property Not Physically Injured" precludes coverage for,

> 'Property damage' to 'impaired property' or property that has not been physically injured, arising out of: (1) a defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work' . . . This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use. . . .
>
> 'Impaired property' means tangible property, other than 'your product' or 'your work,' that cannot be used or is less useful because:
>
> a.  It incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; . . .

(Shah Aff. Ex. 7)

Because the Laurel Creek Complaint alleges damage to other property, this exclusion also does not apply.  The complaint alleges damage to other property resulting from the repair or replacement of the stone fascia.  Such damage does not arise out of the alleged defect inherent in the stone fascia, nor does it fit the definition of "impaired property," which requires that

---

[44]  Additionally, at least one court has interpreted exclusion k. to only apply "when damage occurs to the product itself," making a distinction between allegations that a product is inherently defective and a "product that was subject to damage from another source," concluding that coverage is excluded only in the latter situation. *See Essex Ins. Co. v. Chemical Formula, LLP*, No. 05-364, 2006 U.S. Dist. LEXIS 17314 at *19 (M.D. Pa. April 7, 2006).

the loss result from the *incorporation* of the defective product,
not the loss resulting from repairing other damaged property.
*See Lang Tendons, Inc. v. Northern Ins. Co. of N.Y.,* No. 00-2030,
2001 U.S. Dist. LEXIS 2358 at *23-26 (E.D.Pa. March 7,
2001)(holding that identical exclusion did not preclude coverage
where the underlying complaint alleged failure of the insured's
product which caused damage to other property, and repairs to the
allegedly defective product would damage other property).

　　　Lastly, exclusion n. clearly does not apply because it
requires that the product be "withdrawn or recalled from the
market or from use by any person or organization because of a
known or suspected defect, deficiency, inadequacy or dangerous
condition in it."  Nothing in the Laurel Creek Complaint even
suggests that the stone fascia was recalled from the market or
voluntarily withdrawn from use.  Also, while the complaint does
allege a defect, a reasonable interpretation of the complaint
leads to the conclusion that Schuylkill did not know or suspect
that its product was defective.

　　　Accordingly, the Court concludes that no exclusions apply to
preclude coverage for at least some of the claims and associated
damages asserted in the Laurel Creek Complaint.


**(2)**　**Do the claims fall within the periods of either of Wausau's**
　　　**policies?**

　　　The Court must examine the allegations of the Laurel Creek

Complaint[45] in order to determine when the alleged injuries

caused by the defective stone fascia first manifested themselves.

*D'Auria v. Zurich Ins. Co.*, 352 Pa. Super. 231, 236, 238

---

[45] Wausau alternatively argues that this Court may look beyond the Laurel Creek Complaint to certain evidence produced during discovery to determine whether an occurrence happened within the relevant policy periods. While Wausau cites a few non-controlling cases that determine an insurer's duty to defend by examining matters outside the underlying complaint, the Court finds those cases distinguishable.

*Guaranty Nat'l Ins. Co. v. C de Baca,* applied New Mexico law to hold, in a car accident case, that "a court need not rely on the complaint when the actual date [of the accident] is undisputed." 120 N.M. 806, 810 (1995). The instant case involves a much more complex question: when the injury from an allegedly defective product occurred. Moreover, the parties here do dispute when that injury first manifested itself.

Similarly, most of the Pennsylvania cases cited are not applicable to this specific issue because they do not look to extrinsic evidence to determine when an occurrence took place. In *Henkel Corp. v. Hartford Accident & Indem. Co.,* the district court looked to extrinsic evidence to determine the identity of an insured. 399 F. Supp. 2d 607, 614 (E.D.Pa. 2005)("Here, the issue is not the scope of coverage, rather, the issue is whether the defendants must defend a claim against an entity not insured under the policies."). In *West Am. Ins. Co. v. Lindepuu*, the court used extrinsic evidence to ascertain the nature of the claims asserted in the underlying action after a full trial of the underlying claims had taken place. 128 F. Supp. 2d 220 (E.D.Pa. 2000). The same is true for *Charter Oak Fire Ins. Co. v. Sumitomo Marine and Fire Ins. Co.*, 750 F.2d 267 (3d Cir. 1984)(full trial of underlying claims and cross-claim for indemnification against co-defendant insurer previously determined in state court action).

Lastly, while *Transam. Ins. Co. v. Bellefonte Ins. Co.*, did look to extrinsic evidence to determine when an occurrence occurred, the facts of that case are so different and unique that the Court has no difficulty declining to extend the case. 490 F. Supp. 935, 938 (E.D.Pa. 1980). The district court in *Bellefonte* relied on expert deposition testimony regarding fetal development in a case where the underlying dispute involved parents' and their children's claims for injury resulting from pregnant mothers ingesting a drug later found to cause serious limb deformities in babies.

(1986)("An occurrence happens when the injurious effects of the negligent act first manifest themselves in a way that would put a reasonable person on notice of injury.")(citing *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56 (3d Cir. 1982)).[46]   The relevant allegations state that "[f]rom 1996 to 1997, Toll Bros. built [the Laurel Creek] development in Moorestown, New Jersey." (Shah Aff. Ex. 2)   The Laurel Creek Complaint further asserts that "[t]he construction defects herein, although not immediately apparent, existed when the homes were built . . . . The construction defects were concealed and not discoverable by the purchasers of the homes through the exercise of ordinary diligence."  (Id.)

Thus, all that can be determined from the underlying allegations is that the injuries caused by the allegedly defective stone fascia manifested themselves sometime between 1996 and 2005, when the Laurel Creek Complaint was filed.  As the

---

[46]   Schuylkill alternatively argues that a "multiple trigger theory" should apply in this case.  The Court agrees with Wausau that the multiple trigger theory, which was developed in the context of asbestos litigation, *see, e.g., J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29 (1993), is not appropriate here. *See Lindepuu*, 128 F. Supp. 2d at 225-26 (rejecting multiple trigger theory where underlying dispute involved allegations of negligently installed windows and doors, distinguishing *J.H. France*); *see generally, City of Erie v. Guaranty Nat'l Ins. Co.*, 109 F.3d 156, 164-65 (3d Cir. 1997) (declining to extend the multiple trigger theory to a case not involving "latent disease" and predicting that the Pennsylvania Supreme Court would not apply a multiple trigger theory to an underlying claim for malicious prosecution).

Wausau policies' coverage dates are April 1, 2003 to April 1, 2005, this Court cannot conclude that the alleged injuries did not first manifest themselves during the Wausau coverage period.[47]

On the other hand, because there are no allegations in the underlying complaint from which to even infer when the injury first manifested itself, the Court cannot conclude that the alleged injuries did first manifest themselves during the Wausau policies' periods.  This is significant to the extent that if the facts were known, i.e., if it were undisputed when the "occurrence" happened, it is very unlikely that all three insurers (Wausau, State Auto and Erie) would have a duty to defend.[48]  In this case, the only reason the underlying complaint "may potentially come within the insurance coverage," *Frog, Switch*, 193 F.3d at 746, is because of the *lack* of relevant allegations as to when the injury first manifested itself.[49]  To

---

[47]   *See Frog, Switch*, 193 F.3d at 746 (the duty to defend "arises whenever an underlying complaint may potentially come within the insurance coverage.").

[48]   It is certainly possible that an "occurrence" could last more than one day.  (For example, a severe fire could last several days, or a radiation leak could last even longer.)  The logical extension of this conclusion is that more than one policy could be impicated.  However, given the facts that the Court and the parties do know at this time, it seems highly unlikely that all three insurers' policies will cover the "occurrence" pled.

[49]   As noted above, "the particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered.  Instead it is necessary to look at the factual

hold that Wausau has a duty to defend under these circumstances would be illogical and would create the undesirable incentive for an injured party to be as vague as possible about when its own injury occurred, so as to create coverage where none would exist if the facts were known.[50]

Accordingly, the Court must deny Schuylkill's Motion for Judgment on the Pleadings with respect to Count 5 (unjust enrichment) and the duty to defend portion of Count 4, and deny Wausau's Cross-Motion for Summary Judgment (to the extent the litigation is not stayed pending the outcome of the Laurel Creek Litigation).  For the reasons stated *supra,* the Court holds that either of the Wausau policies may provide coverage because the Laurel Creek Complaint alleges (a) an "occurrence" which (b) resulted in "property damage" that is (c) not excluded from coverage that (d) may have occurred within the relevant coverage period.

---

allegations contained in the complaint." *Mut. Benefit Ins. Co. v. Haver*, 555 Pa. 534, 538 (1999).  The Court believes that the logical corollary to this rule is that coverage cannot be triggered by a lack of factual allegations in the underlying complaint.

[50]  For example, an injured party could file a complaint against an insured driver merely stating that he had an accident sometime between 1993 and 2005, so as to implicate coverage by all insurers who insured the other driver during that 12 year period of time.

**D.**

Given the Court's disposition as to the issues between Wausau and Schuylkill, not much further discussion of the insurers' claims against each other (i.e., Wausau's Motion for Summary Judgment on its claims against State Auto and Erie; and State Auto's and Erie's Cross-Motions for Summary Judgment against Wausau) is required.  Both State Auto and Erie assert that their policies (which have terms identical to Wausau's policies) do not provide coverage, expressly adopting the arguments made by Wausau.  For the reasons set forth in this Opinion, with respect to the duty to defend only, the Court concludes that there is coverage under the terms of the policies and that no exclusion applies– if the damage allegedly created by the fascia was first manifested during the period when a particular policy was in force.

With respect to the question of when the alleged injuries first manifested themselves, and therefore which policy applies, the Court must deny Wausau's Summary Judgment Motion against State Auto and Erie and deny State Auto's and Erie's Cross-Motions against Wausau for substantially the same reason it will deny Wausau's and Schuylkill's motions against each other.[51] The allegations of the Laurel Creek Complaint place the first

---

[51] As discussed *supra*, at Section III., A., Erie's Motion for Summary Judgment with respect to this Court's personal jurisdiction over it will also be denied.

manifestation of the alleged injuries anywhere between 1996 and 2005. Because the underlying complaint contains no allegations from which to infer when the injuries alleged first manifested themselves, summary judgment must be denied.

Lastly, neither State Auto, nor Erie, state any position with respect to staying this litigation as to their alleged duty to indemnify Schuylkill. In the interests of judicial efficiency and avoiding piecemeal litigation, as well as for the reasons cited in *U.S. v. Pennsylvania*, 923 F.2d 1071, 1075-76 (3d Cir. 1991), this Court concludes that the stay should extend to all remaining issues in the case which principally relate to (1) which policy or policies may provide coverage to Schuylkill and; (2) what extent if any, is Wausau entitled to some form of reimbursement from Erie and State Auto for the defense it has provided and is currently providing. Presumably resolution of the underlying state court litigation will help clarify many of the facts necessary to resolve the issues being stayed.

**V.**

For the reasons stated herein, all remaining issues in this case will be stayed. The Court will issue an appropriate order.

Dated: June 6, 2008

　　　　　　　　　　　　　　　　 s/ Joseph E. Irenas
　　　　　　　　　　　　　　　　**JOSEPH E. IRENAS, S.U.S.D.J.**

-42-